# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-16-01498-TUC-JGZ (LCK) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Myron Charles Two Hearts and David Keith Reding, | |
| Defendants. | |

Pending before the Court is Defendant Reding's Motion to Suppress (Doc. 33), which Defendant Two Hearts joined with a supplemental memorandum (Doc. 40). The government responded in opposition. (Doc. 39). Defendant Two Hearts filed a separate motion to suppress, which Defendant Reding joined orally, and the government responded. (Docs. 50, 59.) These matters came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 57.6. Evidence and argument were heard on December 19, 2016, and January 3 and 25, 2017. (Docs. 44, 54, 61.) These matters were submitted following oral argument at the conclusion of the third day of the hearing.

Defendants allege there was not reasonable suspicion to stop their vehicle or to detain the vehicle to await a drug-sniffing dog; therefore, the evidence obtained as a result of the seizure should be suppressed.[1] Having now considered the matter, the

---

[1] Defendant Reding also requested dismissal of the indictment, however, he argues a basis only for suppression and provides no grounds for dismissal. (*See* Doc. 33.)

Magistrate Judge recommends that the District Court, after its independent review, deny Defendants' motions to suppress.

## I. FACTUAL BACKGROUND

Border Patrol Agent Carlos Gutierrez has been with the agency for 12 years and spent 8 of those years in the Ajo sector, including 4 years as a supervisor. (RT 12/19/16 at 5-6.)[2] Of the 18 months he has spent on field duty in a vehicle, a good portion of that was on the reservation. (*Id.* at 7.) Border Patrol Agent Samuel Walsh has been with the agency for 9 years, primarily assigned to the Ajo station. (RT 1/3/17 at 9.) He spent two years focusing on enforcement and deterrence of smuggling out of Menagers on the reservation. (*Id.* at 11.)

On July 5, 2016, Agent Gutierrez was assigned to a stationary position on the Tohono O'odham reservation at the southeast corner of the intersection of Federal Route 1 and State Route 86, which is approximately 140 miles west of Tucson. (RT 12/19/16 at 9-10, 14.) He testified that FR 1 originates in Menagers at the U.S.-Mexico border, and it is a drug corridor, notorious for marijuana smuggling. (*Id.* at 25, 109-10.) The agent has been assigned at that intersection 20-30 times and has personally stopped, in that area, 10 to 20 vehicles that were smuggling marijuana. (*Id.* at 24, 26.)  Agent Gutierrez also has been involved in approximately 80 to 100 stops in that area as a secondary agent where marijuana was smuggled in vehicles. (*Id.* at 26.)

On the morning of July 5, Agent Walsh received a tip via text message that a suspicious vehicle was at the recreation center in Menagers. (RT 1/3/17 at 37, 43, 44, 62.) The tip came from a person that had been a paid informant for Agent Walsh for over one year, receiving approximately $1200, but had not been operating in that capacity for more than a year because the investigation had concluded. (*Id.* at 60, 61, 72, 81-82.) There are no payments for random text tips, only for authorized sources. (*Id.* at 73.) Agent Walsh was familiar with the source and he considered that person to be reliable, although the

---

[2] "RT" refers to the Reporter's Transcripts of the three days of hearings. (Docs. 49, 58, 63.)

agent was not able to verify all past information from the source and not all information led to a seizure and arrest. (*Id.* at 44, 60, 73-74.) The text stated: "a white looks like Honda Accord 4dr acting very suspicious parked here at the rec for few mints then left to eastsd of village. Don't know if it went north already." (Ex. 6.) Agent Walsh relayed the information to the station because he was not in the area. (RT 1/3/17 at 59.) He testified that the recreation center is the only spot that appears open for public parking in Menagers and it is a common stopping point for a driver awaiting a call telling him that drugs are ready for loading. (*Id.* at 82, 86.) As of the 2010 census, Menagers had a population of 161. (Ex. 9.)

Around 8:40 a.m. on July 5, over the radio from the Ajo station, Agent Gutierrez received a be-on-the-lookout (BOLO) for a vehicle – white Honda, 4-door sedan seen in the village of Menagers at the recreation center. (RT 12/19/16 at 10-11; Ex. 5.) Agent Gutierrez had seen a vehicle of the same description heading south on FR 1, approximately an hour earlier, around 7:45 a.m. (RT 12/19/16 at 11-12, 86.) When he noticed the vehicle it was passing him going south and he observed the side of the vehicle, the driver, and the rear of the car. (*Id.* at 12.) Nothing about the vehicle was suspicious and he paid it no particular attention. (*Id.* at 41.) Approximately 15 minutes after the BOLO, Agent Gutierrez observed a white Honda coming northbound on FR 1. (*Id.* at 13.)

The distance from SR 86 to Menagers is about 28 miles and takes approximately half an hour to drive. (*Id.* at 28-29.) The amount of time it would take for a vehicle to drive down and back, with a brief stop at a loading area, was consistent with the length of time between when the white Honda headed southbound to when it returned northbound. (*Id.* at 29-30, 110.) Agent Gutierrez concluded that the car coming northbound was the same one he had seen drive south and that was reported to have been seen in Menagers. (*Id.* at 109.)

Agent Gutierrez observed two people in the white Honda but neither made eye contact with him when they drove past his vehicle, they looked forward. (*Id.* at 18, 20,

1  94-96.) The agent described the driver as having a "death choke" on the steering wheel,
2  gripping it tightly, with hands almost white. (*Id.* at 21-22, 53-54.) Based on his training
3  and experience, Agent Gutierrez perceived that the occupants of the vehicle were nervous
4  because this behavior was not typical for persons stopping at that intersection. (*Id.* at 22,
5  27.) Agent Gutierrez determined the vehicle when driving northbound was riding lower
6  in the back than when it drove southbound, that it was heavier in the back. (*Id.* at 27-28,
7  52, 92, 111; RT 1/25/17 at 9.) In particular, there was a smaller gap in the space between
8  the tire and the wheel well, and the back was bouncing. (RT 12/19/16 at 28, 91-92, 111.)

9          The car stopped at the intersection and turned east on SR 86. (*Id.* at 17.) A records
10 check on the vehicle revealed it was registered to a P.O. Box in Gila Bend. (*Id.* at 32.)
11 Therefore, Agent Gutierrez concluded the occupants were not residents of Menagers,
12 although it's possible it was registered to an address in the San Lucy district of the
13 reservation, which is in Gila Bend.[3] (*Id.* at 33, 55, 57, 78; Ex. 25.) The agent testified that
14 vehicles stopped in that area that are carrying marijuana are commonly not registered out
15 of Menagers. (RT 12/19/16 at 34-35.) The shortest route to Gila Bend from the area
16 would be travelling 15 miles west on SR 86, then 55 miles north on SR 85. (*Id.* at 35.)
17 About 4 miles down SR 86, around 8:55 a.m., Agent Gutierrez stopped the vehicle. (*Id.* at
18 36, 64.) He testified that he stopped the vehicle because of the BOLO regarding the
19 vehicle; it did not appear to be "local traffic," the vehicle was registered to Gila Bend
20 which is approximately 100 miles away from Menagers; three weeks prior he had seized
21 a vehicle on FR 1, which was registered to Gila Bend, loaded with marijuana, and had
22 been to Menagers; the vehicle was riding lower than when it drove southbound; and the
23 driver and passenger appeared nervous. (*Id.* at 32, 69, 74, 80-81, 81-83, 104-05, 108-09.)

24         Agent Gutierrez asked the occupants of the car where they were coming from and
25 one of them stated Menagers. (RT 1/25/17 at 6, 39.) As he approached the car he noticed

---

[3] The transcript reads, "if they're **not** residents of Gila Bend, then by operation – simple logic, they are not residents of Menagers?" (RT 12/19/16 at 33 (emphasis added).) However, it is clear from the context that counsel and the witness meant to indicate that the persons **were** residents of Gila Bend.

- 4 -

in the back seat items he would expect to find in a trunk: spare tire, cables, and cleaning items. (*Id.* at 6, 13, 44.) When asked, Defendant Two Hearts stated that the trunk latch was busted and he couldn't use the trunk, that's why those items were in the back seat. (*Id.* at 6, 44; RT 1/3/17 at 49.) Seeing those items in the back seat, plus Defendant Two Hearts's statement that he couldn't use the trunk when the agent thought the trunk appeared weighted down, heightened Agent Gutierrez's suspicion that there was something illegal in there. (RT 1/25/17 at 7, 8-9.) Additionally, Agent Gutierrez believed Defendant Reding was lying because he stated Defendant Two Hearts picked him up at a hotel in Why and there are no hotels there. (*Id.* at 38-39.) Agent Gutierrez asked if he could search the trunk and the request was denied. (*Id.* at 9; RT 12/19/16 at 64.) Agent Gutierrez did not smell any marijuana when he was near the car. (RT 12/19/16 at 64; RT 1/25/17 at 17.)

He asked Defendants to step out of the vehicle and told them that if they did not consent to a search he would call a K9 Unit. (RT 1/25/17 at 40-41.) At 9:10 a.m., Agent Gutierrez called for a K9 Unit, which arrived in about 40 minutes. (*Id.* at 10-11; RT 12/19/16 at 64-65.) Agent Jeffrey Brooks arrived with a dog and asked Defendant Two Hearts for permission to search the vehicle, which was denied. (RT 1/25/17 at 11-12.) The dog then alerted to the trunk area. (*Id.* at 12.) Marijuana bundles were found in the trunk area, and they were removed through the back seat. (*Id.* at 18-19.)

Agent Walsh was assigned as the case agent and drove out to the location of the stopped car. (RT 1/3/17 at 12.) He testified that the trunk of the car could not be opened with the key or a front latch; someone had to crawl in from the back seat to open it. (*Id.* at 45-46.) Ultimately, he drove the Honda back to the station and interviewed Defendants. (*Id.* at 13.) Subsequently, the prosecution requested that Agent Walsh take some measurements of the vehicle. (*Id.*) Agent Walsh testified that loading 180 pounds into the Honda's trunk (the approximate weight of the marijuana) compressed the rear shocks.[4]

---

[4] The Court reviewed the videos submitted by the government showing the car in motion with and without 180 pounds in the trunk. (Ex. 8.) In light of the brevity and quality of the video as well as the differences between the location at which Agent

- 5 -

(*Id.* at 18, 21.) He agreed that the vehicle rode one-half inch lower with 180 pounds loaded in the trunk.[5] (*Id.* at 51.)

## II. DISCUSSION

Defendants seek to suppress all evidence seized by government agents as a result of what they allege was an unlawful stop and an unreasonably long detention. The government responds that the stop and detention were supported by reasonable suspicion.

**Initial Stop**

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Therefore, an officer must have a "reasonable suspicion" that criminal activity may be afoot to stop a motorist. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002). When the Court makes reasonable-suspicion determinations, it must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for his or her suspicions about criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> . . . .

---

Gutierrez observed the vehicle and the location of filming, the Court did not find the videos probative.

[5] Exhibit 4, page 3 depicts the measurement of approximately 13.75" from the ground to the bottom of the rear bumper with the trunk not loaded. Exhibit 4, page 6 depicts the measurement of approximately 12.5" from the ground to the bottom of the rear bumper with the trunk loaded with approximately 180 lbs. Exhibit 4, page 4 depicts the measurement of the gap between the top portion of the rear wheel and the fender (wheel well) taken from the ground which is approximately 26.5" with the trunk not loaded. Exhibit 4, page 7 depicts the measurement of the gap between the top portion of the rear wheel and the fender (wheel well) taken from the ground which is approximately 26" with the trunk loaded with approximately 180 lbs. (RT 1/3/17 at 19-21.)

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*United States v. Cortez*, 449 U.S. 411, 418 (1981).

Hence, an investigatory stop must be based on facts, not the "mere subjective impressions of a particular officer," *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989), and the inferences drawn by the officer must be objective and reasonable, *Cortez*, 449 U.S. at 418. Under these circumstances, an officer may draw inferences from, and deductions about, the cumulative information based on experience and specialized training, which "might well elude an untrained person." *Id.*; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by local law enforcement officers).

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which the car is traveling; (2) proximity to the border; (3) usual traffic patterns on the road; (4) prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving behavior; (7) vehicle characteristics; and (8) the behavior or appearance of persons in the car. *Brignoni-Ponce*, 422 U.S. at 884-85.

The Court finds that Agent Gutierrez's observations were grounded in objectively identifiable facts, and the totality of the circumstances make clear that the agent had reasonable suspicion. The government is not relying upon Agent Gutierrez's observations about Defendant Reding's race. The Court, therefore, excludes that information from its evaluation. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1139-40 (9th Cir. 2000) (finding reasonable suspicion after excluding consideration of the defendants' likely ethnicity).

1 When Agent Gutierrez stopped the vehicle it was within 30 miles of the border.
2 More critically, he had observed the vehicle drive south and had received a BOLO
3 regarding the vehicle, both of which support his conclusion that the car had done a down-
4 and-back trip to Menagers, which sits on the U.S.-Mexico border. *See United States v.*
5 *Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006) (internal quotations omitted)
6 ("Proximity to the border may be considered as a factor in the reasonable suspicion
7 calculus.") (quoting *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002));
8 *Brignoni-Ponce*, 422 U.S. at 884. The road on which the car was travelling, FR 1, coming
9 from the town of Menagers, was known to Agent Gutierrez as a drug-smuggling corridor.
10 *See United States v. Tiong*, 224 F.3d 1136, 1139-40 (9th Cir. 2000) (finding area
11 contributed to reasonable suspicion because law enforcement articulated facts to support
12 their knowledge of the area as one used for smuggling). Additionally, the car was seen at
13 the recreation center in Menagers, a known spot for smugglers to await a load. *See*
14 *Cortez*, 449 U.S. at 418 ("Consideration of the modes or patterns of operation of certain
15 kinds of lawbreakers" is permitted as part of the reasonable suspicion analysis). Further,
16 Agent Gutierrez knew the car was not registered in the immediate area, and he had
17 stopped a car recently that had been to Menagers, was loaded with marijuana, and also
18 was registered to Gila Bend.

19 Agent Gutierrez observed that the vehicle was riding lower in the rear when it
20 drove north than when it had driven south. This was confirmed to be true by Agent Walsh
21 after-the-fact. Although the difference of the rear wheel/fender gap was determined to be
22 only one-half inch, and the difference from the ground to the bottom of the rear bumper
23 was determined to be approximately 1.25 inches, border patrol agents, not courts, are
24 trained to detect smugglers, and "[t]he facts are to be interpreted in light of a trained
25 officer's experience." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996). That
26 a vehicle appears to be heavily loaded or "riding low" can be considered in evaluating
27 reasonable suspicion for a stop near the border. *See United States v. Medina-Gasca*, 739
28

F.2d 1451, 1453 (9th Cir. 1984); *Brignoni-Ponce*, 422 U.S. at 884 (aspects of the vehicle itself may justify suspicion).

Finally, Agent Gutierrez considered the occupants lack of eye contact and the driver's intense grip on the steering wheel. He testified that it was unusual in that area for persons in vehicles to not acknowledge him in his marked vehicle. The Court considers this observation within the totality of circumstances but gives it little weight. *See Montero-Camargo*, 208 F.3d at 1135-36 (allowing lack of eye contact to be considered depending upon the circumstances but finding it of low value).

The facts presented here support the conclusion that Agent Gutierrez acted with reasonable suspicion when he stopped the vehicle.

**Detention to Await K9 Unit**

Defendants argue that requiring Defendants to wait 40 minutes for the K9 Unit to arrive unreasonably delayed the stop in violation of the Fourth Amendment.

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*United States v. Sharpe*, 470 U.S. 675, 686 (1985). In *Sharpe*, the Court rejected a bright line for when a stop is too long, holding that courts must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* at 685.

Here, the purpose of the stop was to investigate drug trafficking, and the Court found reasonable suspicion for the stop on that basis. When Agent Gutierrez spoke to the occupants of the vehicle, he obtained additional information that reinforced his suspicions. One of the occupants stated that they had been to Menagers, and Agent Gutierrez believed Defendant Reding lied about where Defendant Two Hearts picked him up that day. Most critically, items one would expect to see in the trunk of a vehicle were in the back seat and Defendant Two Hearts stated that he could not use the trunk. Agent Gutierrez had observed the car riding low in the rear indicating weight in the trunk, which

1 was in contradiction to Defendant's statement. After permission to search the car was
2 denied, Agent Gutierrez called for a K9 Unit. Use of a drug-sniffing dog would
3 immediately confirm or dispel his suspicion that the car was involved in smuggling
4 drugs. The closest K9 Unit was 40 minutes away and arrived directly to the scene in that
5 time. In light of the remote area in which the stop occurred, the agent reasonably needed
6 40 minutes to effectuate the purpose of the stop.

7 Defendants rely upon *Rodriguez v. United States*, 135 S.Ct. 1609 (2015); however,
8 that case does not alter this Court's analysis. In *Rodriguez*, the Court held it was
9 unreasonable to prolong a traffic stop even for seven minutes to conduct a dog sniff
10 absent independent reasonable suspicion for the detention. *Id.* at 1614-16. The Court so
11 held because the purpose of a traffic stop is to address the traffic violation, which is not
12 served by a dog sniff aimed at detecting general criminal activity (drug trafficking). *Id.* at
13 1615. In contrast, here, the purpose of the stop was to investigate drug trafficking.
14 Therefore, delaying a stop based on reasonable suspicion for 40 minutes to conduct that
15 investigation was reasonable.

16 **Anonymous Tip – BOLO**

17 Defendants argue (in oral argument and not by written motion) that the BOLO
18 amounted to an anonymous tip which did not possess sufficient indicia of reliability to
19 justify the stop of the vehicle. "To give rise to reasonable suspicion, an anonymous tip
20 must include a range of details and predict future actions by the suspect that are
21 subsequently corroborated by independent police observation." *United States v. Velazco-*
22 *Durazo*, 372 F. Supp. 2d 520, 526 (D. Ariz. 2005) (citing *United States v. Morales*, 252
23 F.3d 1070, 1076 (9th Cir. 2001)). An investigatory stop based on a tip or other secondary
24 information will be upheld when the information has sufficient indicia of reliability that
25 is independently corroborated by law enforcement. *Id.*

26 The Court finds that the BOLO information had sufficient indicia of reliability that
27 was independently corroborated by Agent Guiterrez. Specifically, the make, model and
28 color of the vehicle was consistent with the BOLO; the tip predicted that the vehicle had,

or shortly would be, headed north; the timeframe to and from SR 86 was consistent with arriving at Menagers, staging at the recreation center and returning to SR 86; and, the behavior of the Defendants, coupled with the vehicle riding low and bouncing was consistent with suspicious activity and drug trafficking.

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates*[6] Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable-suspicion context, the only difference being the level of suspicion that must be established. Contrary to the court below, we conclude that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment.

*Alabama v. White*, 496 U.S. 325, 330-31 (1990). In this case, the BOLO was sufficiently corroborated to furnish reasonable suspicion that Defendants were engaged in criminal activity. However, even without the BOLO, Agent Guiterrez had reasonable suspicion to investigate for drug trafficking.

### III. RECOMMENDATION

It is recommended that, after its independent review of the record, the District Court deny Defendants' Motions to Suppress (Docs. 33, 50).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections. In light of the trial date, objections shall be filed on or before

---

[6] *Illinois v. Gates*, 462 U.S. 213 (1983).

- 11 -

1  **February 17, 2017**. A party may respond to the other party's objections on or before
2  **February 27, 2017**. No reply brief shall be filed on objections unless leave is granted by
3  the district court. If objections are not timely filed, they may be deemed waived.
4      Dated this 7th day of February, 2017.

                                      Honorable Lynnette C. Kimmins
                                      United States Magistrate Judge